[Cite as *State v. Abdelhady*, 2026-Ohio-2931.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                                         No. 115345

    v.                               :

ABDALLAH ABDELHADY,                         :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
                   AND REMANDED
**RELEASED AND JOURNALIZED:** July 30, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-684756-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Lisa J. Turoso, Assistant Prosecuting Attorney, *for appellee.*

Flowers & Grube, Louis E. Grube, and Michael J. Factor, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Abdallah Abdelhady ("Abdelhady") appeals his convictions and sentence, following a jury trial for kidnapping, felonious assault, and strangulation. After a thorough review of the record and applicable law, we

affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I.    Facts and Procedural History

{¶ 2} On October 30, 2023, the Cuyahoga County Grand Jury returned a seven-count indictment against defendant-appellant Abdelhady arising from his alleged conduct toward F.Q. during the period of April 22, 2022, through September 1, 2023. Count 1 charged kidnapping in violation of R.C. 2905.01(A)(3), a first-degree felony, alleging that Abdelhady, by force, threat, or deception, removed F.Q. from the place where she was found or restrained her liberty for the purpose of terrorizing or inflicting serious physical harm upon her, on or about April 22, 2022, to September 1, 2023. Counts 2 and 3 charged felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony, and domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor, both arising from an alleged incident on or about August 6, 2023. Counts 4 through 7 arose from an alleged incident on or about August 30, 2023, and charged felonious assault under R.C. 2903.11(A)(1), a second-degree felony; strangulation under R.C. 2903.18B2, a third-degree felony; strangulation under R.C. 2903.18(B)(3), a fourth-degree felony; and domestic violence under R.C. 2919.25(A), a first-degree misdemeanor. The indictment further alleged that F.Q. was a family or household member of Abdelhady's for purposes of Counts 3, 6, and 7.

{¶ 3} Abdelhady entered a plea of not guilty to all seven counts on November 17, 2023. The matter proceeded to a jury trial commencing on May 28,

2025. After the initial venire was stricken on Abdelhady's motion and with the State's agreement, jury selection was completed and trial proceeded over two days on May 30 and June 2, 2025. Tr. 181-196.

{¶ 4} The State's first witness, a homeowner in the area, testified that on September 1, 2023, she arrived home from work to her residence in North Olmsted. Tr. 403. As she pulled into her driveway, she observed a woman running down the bike path behind her home. Tr. 403-404. The woman made eye contact with the homeowner, turned toward her, and asked if she could hide in the homeowner's garage because she was scared. Tr. 404. The homeowner described the woman as having "bruises all over her face," appearing "puffy and swollen," and "really scared." Tr. 404. The homeowner offered to call 9-1-1, but the woman declined, asking only to call her mother or grandmother. Tr. 405. The homeowner permitted the woman to wait inside the garage with the door closed, entered her home, and called 9-1-1 notwithstanding the woman's wishes. Tr. 406, 412. While they waited, the woman told the homeowner that she had been in a car with girls who started assaulting her up and that she had run out afterward. Tr. 410.

{¶ 5} North Olmsted Patrol Officer Richard Juergens ("Officer Juergens") responded within minutes alongside additional officers. Tr. 510-512, 516-517. When the garage was opened, Officer Juergens observed the woman in a defensive posture with her hands up, speaking on the phone, and appearing "extremely scared." Tr. 512. Upon her exiting from the garage, he observed that she had been "severely beaten" and had "extensive injuries to her face." Tr. 513. He called for an

ambulance. Tr. 513. The woman, later identified as F.Q., was at that time on the phone with Ayman Abdelhady, whom she described to Officer Juergens as "her stepmother." Tr. 518-519.

{¶ 6} F.Q. initially told Officer Juergens that three females — two white and one Hispanic — came to the door of her Cleveland apartment the night before, at approximately 11:00 p.m. or 11:30 p.m. Tr. 514-515. She stated that the women rushed in, assaulted her, and locked her in her bedroom overnight. Tr. 514. She told the officer that two of the three women returned, removed her from the apartment, placed her in a white SUV, and drove her to a location east of the homeowner's residence. *Id.* She claimed she was able to unlock the door, escape, and run west until she reached the homeowner's residence. *Id.* F.Q. further suggested that the women had been sent to assault her up by her ex-boyfriend, whom she identified as "Eric Lawson," and provided a date of birth. Tr. 515. Officer Juergens later searched the name and date of birth in the police database and obtained no results, leading him to suspect that the person did not exist. *Id.* Combined with F.Q.'s shaking and what he perceived as evasive and minimal answers, Officer Juergens did not believe she was telling him the truth. Tr. 516. Officers patrolled the area for the described white SUV but found none. Tr. 517.

{¶ 7} North Olmsted Police Sergeant Sarah Holmes ("Sergeant Holmes") testified that she traveled to St. John's Medical Center the following day to interview F.Q. and photograph her injuries, both because she was a certified evidence technician and because women often communicate more openly with female

officers. Tr. 525. Sergeant Holmes photographed extensive bruising and injuries across F.Q.'s face, neck, torso, arms, hands, and lower extremities. Tr. 529. Sergeant Holmes also reviewed data from Flock cameras, investigative tools that record license plates at intersections, and observed that Abdelhady's vehicle passed through certain intersections in the area during a time frame consistent with when F.Q. would have been in the general vicinity. Tr. 534. Sergeant Holmes acknowledged that she could not identify who was inside the vehicle from the Flock images and that the cameras were located near Abdelhady's family home in Westlake. Tr. 535-536.

{¶ 8} Nurse Terry Harb ("Nurse Harb") of St. John's Medical Center testified that she treated F.Q. on September 1, 2023, and was initially told that F.Q. had been "jumped by a number of girls in her apartment." Tr. 592. Nurse Harb became concerned for F.Q.'s safety after receiving a phone call from a male claiming to be F.Q.'s brother; after consulting with F.Q. and her mother, it appeared that the caller was instead F.Q.'s ex-boyfriend attempting to locate her. Tr. 586-587, 592. Nurse Harb notified hospital security. Tr. 586-587. Medical records reflected bruising up and down F.Q.'s body, facial swelling, and tender ribs. Tr. 584. F.Q. was administered intravenous fentanyl at approximately 9:32 p.m. on September 1, 2023, and intravenous Dilaudid at 12:37 a.m. on September 2, 2023. Oral Percocet was administered later in the morning of September 2, 2023, and additional doses were provided for home use upon discharge.

{¶ 9} F.Q. testified that she had been in a relationship with Abdelhady since approximately 2017. Tr. 417-418. During the year leading up to September 2023, F.Q. lived in a one-bedroom basement apartment on Rocky River Drive in Cleveland, where Abdelhady stayed with her for over a year, though he also occasionally stayed at his family's home in Westlake. Tr. 418-420. F.Q.'s mother and two sisters lived in the same apartment complex, with F.Q.'s mother residing in the unit directly above hers. Tr. 420-421, 470-471.

{¶ 10} As to the events of August 6, 2023, F.Q. testified that it had been a "rough week" during which Abdelhady had repeatedly beaten her. Tr. 422. Her eyes and face were swollen, and she had been punched in the face, knocked down, and stomped upon. Tr. 422-423. Abdelhady also struck her on her sides, thighs, and legs, stating at trial, "[a]nywhere that was accessible." Tr. 423. Because of the consistency of the beatings, F.Q. testified that she did not have any opportunity to heal and she became worried about her injuries to her face, head, and ribs. Tr. 423. When Abdelhady left the apartment to walk to a store about a street away to purchase cigarettes, F.Q. fled through the back door. Tr. 423. Two houses up the street, she encountered a father and son in their yard who transported her to Fairview Hospital, although she did not tell them that Abdelhady had hurt her. Tr. 423-424. At the hospital, F.Q. did not disclose the truth of what had occurred because she was "scared" and "afraid of the retaliation" against herself and her family. Tr. 424-425. She testified that Abdelhady had repeatedly threatened her and her family. Tr. 425. F.Q. sustained fractured ribs, swollen eyes, and an open

wound on her face and left side. Tr. 426. F.Q. testified that she ultimately called Abdelhady from the hospital out of fear, and he came to the hospital and forced her to leave, requiring her to remove her own IV; she then returned with him to the Rocky River Drive apartment. Tr. 427-428.

{¶ 11} As to the events leading to August 30, 2023, F.Q. testified to another "bad week" during which she had been slapped in the face repeatedly, her face was again swollen, and the injuries on each side of her face were open and continuously bleeding. Tr. 429. Abdelhady would instruct her to place her hands at her sides and stand still so he could smack her back and forth until she fell to the ground. Tr. 429. On August 30, 2023, Abdelhady and F.Q. were traveling to one of his friends' homes. Tr. 429. Abdelhady directed F.Q. to remain hidden in the back of the van because her injuries were still noticeable. Tr. 429. When Abdelhady went inside the friend's house, F.Q. exited the vehicle, ran across a creek and behind houses, and flagged down the earlier mentioned homeowner. Tr. 429-430. F.Q. testified that had she returned home with Abdelhady, she did not believe she would have remained alive. Tr. 430.

{¶ 12} F.Q. acknowledged that she initially fabricated the story about the three women and "Eric Lawson" out of fear of retaliation by Abdelhady. Tr. 431, 479. She also acknowledged that the "ex-boyfriend" she described to police was a person named Jacob, although she denied recalling many of the details of the original story she had given. Tr. 475-478, 480, 490. F.Q. testified that a nurse who she believed had been in a similar situation eventually convinced her to disclose

what had actually happened and that nurse contacted F.Q.'s mother, who arrived at the hospital with F.Q.'s sister.  Tr. 431-432.

{¶ 13}  F.Q. testified that her injuries resulted from Abdelhady punching, kicking, and throwing her, and striking her with various objects.  Tr. 436.  Her finger was "busted" while she attempted to shield herself.  Tr. 437.  She suffered facial bruising from repeated punches, bruises on her feet from being thrown to the ground or from kicking while attempting to escape, a lacerated lip, and head bruising from being slammed against a wall.  Tr. 438.  F.Q. testified that Abdelhady choked her from behind until she lost consciousness, leaving bruising around her neck.  Tr. 439.  He struck her with a broken lamp on her back and buttocks.  Tr. 440. F.Q. further testified that Abdelhady forced her to burn off part of her tattoo using a metal spoon heated with a torch and that he locked her in a dog cage and struck her with a stick through the cage holes.  Tr. 441, 450.  Throughout the assaults, Abdelhady used both open-handed and closed-fist blows.  Tr. 439.  F.Q. also testified that Abdelhady cut her hair on multiple occasions, including shortly before the August 30, 2023 incident.  Tr. 428.

{¶ 14}  F.Q. was discharged within five to six hours of her arrival at St. John's Medical Center and went to stay at her cousin's apartment for several weeks.  Tr. 446.  Her mother, father, and sister later returned to her apartment, where they took photographs; the top of her bed bearing a bloodstain had been cut off, and bedding had been removed.  Tr. 447.  Photographs also depicted blood spatter on her bedroom wall, which F.Q. attributed to being struck in the face by

Abdelhady. Tr. 452. She described being cornered, beaten, punched, and slapped in that area. Tr. 452.

{¶ 15} Abdelhady testified in his own defense. He denied being with F.Q. on August 30, 31, or September 1, 2023, stating that he had been at work or at his home. Tr. 666-667. He acknowledged that the homeowner's residence was approximately a mile and a half from his home and that he regularly drove on streets in that area. Tr. 667. Abdelhady, who was 30 years old at the time of trial, testified that he had never spent consecutive nights with F.Q. and that he had a strict curfew imposed by his parents. Tr. 671-673. He denied any role in F.Q.'s injuries and denied burning her tattoo or cutting her hair. Tr. 666-667.

{¶ 16} On June 3, 2025, during deliberations, the jury submitted a written question to the court: "In the event that we are unanimous on some counts & not on other counts — is that acceptable?" Although the trial court had earlier indicated that jury questions "usually will be answered in open court," the record does not reflect that any answer was given before the jury returned its verdict. Tr. 772, 776-777.

{¶ 17} The jury returned its verdicts on June 3, 2025, finding Abdelhady guilty of kidnapping as charged in Count 1, felonious assault as charged in Count 4, and strangulation as charged in Count 5. Tr. 778-779. The jury found Abdelhady not guilty of felonious assault as charged in Count 2, domestic violence as charged in Counts 3 and 7, and strangulation as charged in Count 6.

{¶ 18} The trial court conducted the sentencing hearing on June 20, 2025. Tr. 785. Abdelhady, through counsel, argued that he had no prior history of violent felony offenses and requested that the court impose either community control or the minimum three-year prison term. Tr. 799-801, 807. Counsel also opposed consecutive sentences, contending that none of the factors enumerated in R.C. 2929.14(C)(4) applied. Tr. 800. Concurrently with the sentencing hearing, Abdelhady entered a plea agreement in a separate matter, Case No. CR-23-686432-A, with the prison sentence in that matter to run concurrently to the sentence imposed in the present case. Tr. 785-792, 817.

{¶ 19} The trial court imposed an aggregate stated prison term of 12 to 17.5 years. Tr. 814-816. On Count 1, kidnapping, the court imposed a minimum term of 11 years and a maximum term of 16.5 years pursuant to the Reagan Tokes Law. On Count 4, felonious assault, the court imposed a four-year term, to run concurrently with Counts 1 and 5. On Count 5, strangulation, the court imposed a one-year term, to run consecutively to Count 1. The court advised Abdelhady that he was subject to a mandatory minimum of two years and up to a maximum of five years of postrelease control on Count 1.

{¶ 20} In imposing consecutive sentences at the hearing, the trial court stated on the record that "[t]wo or more of the multiple offenses committed as a single course of conduct and harm so great or unusual that a single term does not adequately reflect the seriousness of the conduct." Tr. 814-815. Later that same day, the trial court journalized its sentencing entry, which included additional

consecutive-sentence findings not articulated on the record at the hearing, namely that consecutive service was necessary to protect the public from future crime or to punish the defendant and that consecutive sentences were not disproportionate to the seriousness of the defendant's conduct and to the danger he posed to the public. Journal Entry No. 197676459 (June 20, 2025).

{¶ 21} Abdelhady timely filed his notice of appeal assigning three errors for our review:

> 1. The jury's guilty verdicts were against the manifest weight of the evidence;
>
> 2. The trial court erred and abused its discretion by admitting lay opinion testimony going to the ultimate issue and denying the defendant's motion for mistrial; and
>
> 3. The trial court erred by imposing consecutive sentences.

## II.  Manifest Weight of the Evidence

{¶ 22} In his first assignment of error, Abdelhady contends that the jury's guilty verdicts on Counts 1, 4, and 5 were against the manifest weight of the evidence. He argues that F.Q.'s account of the events of August 30, 2023, was inconsistent, unreliable, and influenced by the administration of strong pain medication and repeated police questioning and that the jury lost its way in crediting her testimony.

### A. Standard of Review

{¶ 23} A challenge to the manifest weight of the evidence is distinct from a challenge to the sufficiency of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  Whereas a sufficiency challenge tests the adequacy of the evidence as a matter of law, "[w]eight of the evidence concerns 'the inclination of the greater

amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" *Id.*, quoting *Black's Law Dictionary* 1594 (6th Ed. 1990).

{¶ 24} When reviewing a manifest-weight challenge, the appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of conflicting testimony. *Thompkins* at 387. The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether; in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*; *State v. Rogers*, 2018-Ohio-3495, ¶ 21 (8th Dist.).

{¶ 25} The discretionary power to grant a new trial on manifest-weight grounds, however, "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). The trier of fact is in the best position to weigh the evidence and assess the credibility of the witnesses, because it observed their demeanor, gestures, and voice inflections, and used those observations to weigh the credibility of the testimony. *State v. C.M.*, 2018-Ohio-1825, ¶ 33 (8th Dist.). A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact, or because the reviewing court might have reached a different conclusion. *State v. Morris,* 2023-Ohio-4021, ¶ 41 (3d Dist.).

## B. Law and Analysis

{¶ 26} Abdelhady was convicted of kidnapping in violation of R.C. 2905.01(A)(3), felonious assault in violation of R.C. 2903.11(A)(1), and strangulation in violation of R.C. 2903.18(B)(2). The acts underlying Counts 4 and 5 were alleged to have occurred on August 30, 2023, while the kidnapping in Count 1 was alleged to have occurred at some point between April 22, 2022, and September 1, 2023.

{¶ 27} The State's case rested on the testimony of F.Q., who described being assaulted and confined by Abdelhady, and on the testimony of the witnesses who encountered her on September 1, 2023, after she fled to a North Olmsted residence. The homeowner testified that F.Q. appeared at her home in a visibly injured and frightened state, with bruising and swelling about her face, and asked to hide in the homeowner's garage. Officer Juergens responded to the scene and observed that F.Q. had been "severely beaten and had extensive injuries to her face." An ambulance was called, and F.Q. was transported for medical treatment.

{¶ 28} Abdelhady emphasized that F.Q. initially told both the homeowner and Officer Juergens that she had been attacked by three females, not by him. F.Q. provided a detailed narrative of this version of events to Officer Juergens, describing how three women came to her apartment around 11:00 p.m. or 11:30 p.m. the night before, "rushed in and beat her," and "locked her in her bedroom overnight." Only later, after she had received medical treatment, including the administration of fentanyl and Dilaudid, and after being interviewed by police on multiple occasions,

did F.Q. identify Abdelhady as her assailant. Abdelhady contends that this shift in F.Q.'s account, combined with the influence of strong narcotic pain medications and what he characterizes as suggestive questioning, renders her testimony so unreliable that no reasonable jury could credit it.

{¶ 29} The arguments Abdelhady raised, however, go to the credibility of the State's witnesses, and credibility determinations are primarily reserved for the trier of fact. *C.M.*, 2018-Ohio-1825, at ¶ 33. The jury heard F.Q.'s testimony, heard the testimony of the witnesses who first encountered her, and heard the cross-examination concerning her prior inconsistent statements, her medicated state, and the circumstances of her subsequent identification of Abdelhady. The jury was in the best position to assess F.Q.'s demeanor and to determine whether the explanation she offered for her initial inconsistent account, the fear of Abdelhady and the desire to protect him or others, was credible. *See State v. Meadows*, 2020-Ohio-802, ¶ 27 (8th Dist.).

{¶ 30} The jury's verdict reflects a careful and discriminating evaluation of the evidence rather than a wholesale acceptance of the State's case. The jury acquitted Abdelhady of Counts 2, 3, 6, and 7, while convicting him only on Counts 1, 4, and 5. That selective verdict demonstrates the jury carefully reviewed the evidence count by count, distinguishing between the alleged August 6, 2023 incident, on which it acquitted, and the August 30, 2023 incident, on which it convicted. Although Abdelhady suggested that the split verdict reflects an improper compromise, a split verdict is at least equally consistent with the conclusion that the

jury found the evidence supporting some counts to be persuasive while finding the evidence supporting others to be lacking. The mere fact that a jury returns a mixed verdict does not, standing alone, demonstrate that it lost its way.

{¶ 31} The physical evidence in this case substantially corroborated F.Q.'s ultimate account. The extensive bruising and swelling about her face, observed by both the homeowner and Officer Juergens, was independently documented and was consistent with a recent assault. F.Q.'s flight to a stranger's home, her request to hide in the garage, and her visible fear were all observed by a disinterested witness. This testimony provided objective corroboration that an assault had occurred shortly before F.Q. encountered the homeowner, independent of F.Q.'s own account of who had perpetrated it.

{¶ 32} As to F.Q.'s use of pain medication and her repeated interviews by police, those circumstances were presented to the jury through testimony and argument. Defense counsel had the opportunity to cross-examine the State's witnesses on these issues and to argue their significance during closing argument. The jury was entitled to consider this evidence and weigh it accordingly. That the jury ultimately credited F.Q.'s in-court testimony, notwithstanding the matters raised by the defense, was within its province as the trier of fact. *See Thompkins*, 78 Ohio St.3d at 387.

{¶ 33} On review of the entire record, this court cannot say that the jury clearly lost its way or created a manifest miscarriage of justice in convicting Abdelhady of kidnapping, felonious assault, and strangulation. This is not the

"exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387. To the contrary, F.Q.'s testimony, corroborated by the observations of the homeowner and Officer Juergens and by the documented physical injuries, provided a substantial basis upon which a reasonable jury could find Abdelhady guilty beyond a reasonable doubt on Counts 1, 4, and 5.

{¶ 34} Abdelhady's first assignment of error is overruled.

## III. Admitted Testimony

{¶ 35} In Abdelhady's second assignment of error, he argues that the trial court erred and abused its discretion by admitting lay opinion testimony from Sergeant Holmes regarding the cause of F.Q.'s neck bruise and by denying his motion for a mistrial on that basis. He contends that Sergeant Holmes lacked the training and experience necessary to opine that the bruise was consistent with strangulation and that her testimony improperly invaded the province of the jury on the ultimate issue.

### A. Standard of Review

{¶ 36} A trial court has broad discretion in the admission or exclusion of evidence, and absent a clear abuse of that discretion that materially prejudices the defendant, a reviewing court will not disturb the trial court's ruling. *State v. Haynik*, 2023-Ohio-717, ¶ 38 (8th Dist.); *State v. Morris*, 2014-Ohio-5052, ¶ 14. An abuse of discretion occurs if a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 37} The admissibility of lay opinion testimony is governed by Evid.R. 701, which permits a lay witness to offer opinions or inferences that are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. *State v. McKee*, 91 Ohio St.3d 292, 296 (2001). Likewise, Evid.R. 704 provides that testimony in the form of an opinion is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact, but such testimony must still satisfy the foundational requirements of Evid.R. 701. *McKee* at 296.

{¶ 38} "Denial of a motion for mistrial is within the sound discretion of the trial court and will not be overturned on appeal absent an abuse of discretion." *State v. Robinson*, 2022-Ohio-1940, ¶ 30 (8th Dist.), citing *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). A mistrial should be granted only when the ends of justice so require and a fair trial is no longer possible. *Id.* at ¶ 31.

**B. Law and Analysis**

{¶ 39} Abdelhady challenges the admission of testimony from Sergeant Holmes in which she offered her opinion that a particular bruise observed on F.Q.'s neck was consistent with strangulation. He contends that Sergeant Holmes lacked specialized training or experience in identifying strangulation injuries and that her testimony improperly invaded the province of the jury on the ultimate issue of whether the strangulation offense in Count 5 had been committed.

{¶ 40} The record reflected that Sergeant Holmes, a North Olmsted police officer and certified evidence technician, responded to the hospital on September 1,

2023, and photographed F.Q.'s injuries in detail. Tr. 525, 529. Sergeant Holmes testified concerning her observations of the extensive bruising she documented on F.Q.'s face, neck, and body. Tr. 529. Among those observations, Sergeant Holmes identified a bruise on F.Q.'s neck and offered her view that the mark was consistent with a strangulation injury.

{¶ 41} Under Evid.R. 701, a police officer may testify to opinions or inferences that are rationally based on what the officer personally perceived and that are helpful to the jury's determination of a fact in issue. *McKee*, 91 Ohio St.3d at 296; *Haynik*, 2023-Ohio-717, at ¶ 39 (8th Dist.). This court has consistently recognized that an officer's observations regarding the nature and appearance of injuries, made during the course of an investigation, fall within the scope of permissible lay opinion testimony when grounded in the officer's firsthand perception. *Haynik* at ¶ 39-41. Such testimony is not transformed into impermissible expert opinion merely because the officer draws upon training and experience in describing what he or she observed. *State v. Jones*, 2020-Ohio-3367, ¶ 25 (8th Dist.).

{¶ 42} Sergeant Holmes's testimony was grounded in her direct perception of F.Q.'s injuries, which she personally observed and photographed at the hospital. Tr. 525, 529. Her opinion that the bruise on F.Q.'s neck appeared consistent with strangulation was a rational inference drawn from what she saw, and it was helpful to the jury in evaluating the physical evidence presented through the photographs admitted as State's exhibit Nos. 2-11 and 13-35. The fact that the opinion touched

upon an ultimate issue in the case did not render it inadmissible under Evid.R. 704. *McKee* at 296. The jury remained free to accept or reject Sergeant Holmes's opinion, and defense counsel had a full opportunity to cross-examine her concerning the limits of her training and the basis for her observations. Tr. 534-536.

{¶ 43} Moreover, even assuming that admission of Sergeant Holmes's opinion testimony was an error, any such error was harmless in light of the substantial independent evidence supporting the strangulation conviction. F.Q. testified at length concerning the assaults inflicted upon her by Abdelhady, including the August 30, 2023 incident that gave rise to Count 5. Tr. 428-430, 436. The jury also viewed photographs documenting the extensive bruising on F.Q.'s body, including her neck, and heard medical testimony from Nurse Harb describing F.Q.'s injuries. Tr. 584. The State did not need to rely on Sergeant Holmes's brief opinion to establish the strangulation offense beyond a reasonable doubt.

{¶ 44} With respect to the denial of the motion for mistrial, the record did not demonstrate that Sergeant Holmes's testimony deprived Abdelhady of a fair trial. A mistrial is an extreme remedy reserved for those situations in which a fair trial is no longer possible. *Robinson*, 2022-Ohio-1940, ¶ 31. The trial court was in the best position to assess the impact of the challenged testimony on the jury, and we cannot say that the court exercised its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 45} Accordingly, the trial court did not abuse its discretion in admitting Sergeant Holmes's lay opinion testimony or in denying Abdelhady's motion for mistrial.

{¶ 46} Abdelhady's second assignment of error is overruled.

## IV. Consecutive Sentences

{¶ 47} In his third assignment of error, appellant contends that the trial court erred by imposing consecutive sentences. Specifically, appellant argues that the trial court failed to make all of the consecutive-sentence findings required by R.C. 2929.14(C)(4) on the record at the sentencing hearing and that the record does not clearly and convincingly support the findings that should have been made.

### A. Standard of Review

{¶ 48} R.C. 2953.08(G)(2) governs appellate review of consecutive-sentence challenges. *State v. Gwynne*, 2022-Ohio-4607, ¶ 11. Under that statute, an appellate court may increase, reduce, modify, or vacate and remand a challenged sentence if it clearly and convincingly finds that either (1) the record does not support the sentencing court's findings under R.C. 2929.14(C)(4), or (2) the sentence is otherwise contrary to law. R.C. 2953.08(G)(2); *State v. Glover*, 2024-Ohio-5195, ¶ 28.

{¶ 49} In order to impose consecutive sentences, the trial court must make the findings required by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry. *State v. Bonnell*, 2014-Ohio-3177, ¶ 37. Those findings are: (1) that consecutive sentences are necessary to

protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the three additional findings set forth in R.C. 2929.14(C)(4)(a), (b), or (c) applies. R.C. 2929.14(C)(4); *Bonnell* at ¶ 28.

{¶ 50} The trial court is not required to recite the statute verbatim or use "talismanic words," but the record must reflect that the court engaged in the required analysis and made the necessary findings. *Bonnell* at ¶ 29, 37. A trial court's failure to make the findings required by R.C. 2929.14(C)(4) renders the imposition of consecutive sentences contrary to law. *Id.* at ¶ 37; *State v. Glover*, 2024-Ohio-5195, at ¶ 44.

### B. Law and Analysis

{¶ 51} As an initial matter, the record reflects that the trial court did not make all three of the findings required by R.C. 2929.14(C)(4) on the record at the sentencing hearing. At sentencing, the trial court stated only the following: "Two or more of the multiple offenses committed as a single course of conduct and harm so great or unusual that a single term does not adequately reflect the seriousness of the conduct." Tr. 814-815. That statement, on its face, addressed only the third statutory finding under R.C. 2929.14(C)(4)(b). The trial court did not state at the sentencing hearing that consecutive service was necessary to protect the public from future crime or to punish the offender, nor did it state that consecutive sentences

were not disproportionate to the seriousness of appellant's conduct and to the danger appellant posed to the public. Tr. 814-815.

{¶ 52} Although the trial court later journalized the full complement of R.C. 2929.14(C)(4) findings in the sentencing entry, those additional findings appeared for the first time in writing. Journal Entry No. 197676459 (June 20, 2025). Under *Bonnell*, both steps are required: the trial court must make the findings at the sentencing hearing and incorporate them into its judgment entry. *Bonnell*, 2014-Ohio-3177, at ¶ 37. The inclusion of additional findings in the journal entry that were never announced at the hearing does not satisfy *Bonnell's* requirement that the findings be made on the record at the sentencing hearing. *Id.*; *see also State v. Herring*, 2023-Ohio-4851, ¶ 16-17 (9th Dist.) (consecutive sentences contrary to law where one or more required findings were absent from the sentencing-hearing record, even though they appeared in the journal entry).

{¶ 53} Because the trial court did not make all of the findings required by R.C. 2929.14(C)(4) at the sentencing hearing, its imposition of consecutive sentences was contrary to law. *Bonnell* at ¶ 37; R.C. 2953.08(G)(2)(b). Where a trial court fails to make the required consecutive-sentence findings at the sentencing hearing, the remedy is to vacate the consecutive-sentence order and remand the matter to the trial court to consider whether consecutive sentences are appropriate under R.C. 2929.14(C)(4) and, if so, to make the required findings on the record. *Bonnell* at ¶ 37; *Glover*, 2024-Ohio-5195, at ¶ 30.

{¶ 54} In light of the foregoing, we need not reach appellant's further argument that the record does not clearly and convincingly support the findings that should have been made. On remand, the trial court is to determine in the first instance whether consecutive sentences are appropriate, and, if it concludes they are, to make the required R.C. 2929.14(C)(4) findings on the record at the resentencing hearing and incorporate them into a new sentencing entry. We express no opinion regarding the proper outcome of that determination.

{¶ 55} Abdelhady's third assignment of error is sustained.

{¶ 56} Judgment affirmed in part, vacated in part, and remanded to the trial court for resentencing.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

EMANUELLA D. GROVES, P.J., and
TIMOTHY W. CLARY, J., CONCUR